## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED AUBURN INDIAN COMMUNITY OF THE AUBURN RANCHERIA, 10720 Indian Hill Road, Auburn, California 95603 | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street NW, Washington, D.C. 20240 | |
| BUREAU OF INDIAN AFFAIRS, 1849 C Street NW, Washington, D.C. 20240 | |
| BRYAN MERCIER, IN HIS OFFICIAL CAPACITY EXERCISING THE DELEGATED AUTHORITY OF THE ASSISTANT SECRETARY – INDIAN AFFAIRS, U.S. DEPARTMENT OF THE INTERIOR 1849 C Street NW, Washington, D.C. 20240 | |
| SCOTT DAVIS, IN HIS OFFICIAL CAPACITY AS PRINCIPAL DEPUTY ASSISTANT SECRETARY – INDIAN AFFAIRS, U.S. DEPARTMENT OF THE INTERIOR, 1849 C Street NW, Washington, D.C. 20240, and | |
| PHILIP BRISTOL, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE OFFICE OF INDIAN GAMING, U.S. DEPARTMENT OF THE INTERIOR, 1849 C Street NW, Washington, D.C. 20240 | |
| Defendants. | |

2890305

## I.    INTRODUCTION

1.    Plaintiff United Auburn Indian Community of the Auburn Rancheria ("UAIC") brings this action against the U.S. Department of the Interior ("DOI"), the Bureau of Indian Affairs ("BIA"), Acting Assistant Secretary for Indian Affairs Bryan Mercier, Principal Deputy Assistant Secretary for Indian Affairs Scott Davis, and Acting Director of the Office of Indian Gaming Philip Bristol to challenge Defendants arbitrary, capricious, and otherwise unlawful January 10, 2025 decision ("January 10 Decision") to take land into trust on behalf of the Scotts Valley Band of Pomo Indians ("Scotts Valley").  *See* Ex. A.

2.    This case arises from Defendants' rushed, unreasoned, results-driven decision to approve the acquisition of land for a massive off-reservation Indian gaming development.  On January 10, 2025, cognizant of the approaching transition to a new administration, Defendants improperly forced through a final decision acquiring land in trust for Scotts Valley in Vallejo, California (the "Vallejo Site").

3.    In issuing this decision, Defendants effectively signed off on the development of a massive 615,000 square-foot casino, office building, and residences — all at the center of a major metropolitan area, at the intersection of two major freeways, adjacent to sensitive habitat on protected open land, at a site to which Scotts Valley has *no meaningful tribal links*.

4.    Defendants' decision was arbitrary, capricious, and unlawful many times over.  In their haste to ensure approval of the Scotts Valley application, Defendants disregarded countless legal and procedural guardrails against abusive and unreasoned agency decisionmaking.

5.    For example, Defendants systematically excluded UAIC, excluded or disregarded the evidence and comment UAIC attempted to provide, impeded UAIC's efforts to participate in comment and review, and ignored UAIC's repeated efforts to exercise the right of consultation

1

as an affected tribe.  Defendants similarly excluded numerous other interested and affected

tribes.  Defendants even excluded the Patwin tribes whose traditional homelands encompass the

Vallejo Site: the Yocha Dehe Wintun Nation ("Yocha Dehe") and the Kletsel Dehe Wintun

Nation ("Kletsel Dehe").

6.    Defendants likewise ignored or violated the well-established requirements

associated with taking land into trust for off-reservation gaming, as well as the record

conclusively demonstrating that Scotts Valley's application must be denied.  Scotts Valley has a

history of pursuing failed trust applications for land far outside its traditional homelands, selected

purely for proximity to larger and more lucrative gambling markets.  Scotts Valley's application

at the Vallejo Site was no different.  Yet Defendants failed to account for these and numerous

other defects in Scotts Valley's application, in violation of the Administrative Procedure Act

("APA"), the Indian Reorganization Act ("IRA"), and the Indian Gaming Regulatory Act

("IGRA").

7.    Defendants likewise abandoned any effort to engage in meaningful environmental

review under the National Environmental Policy Act ("NEPA").  Defendants issued a defective

and incomplete Environmental Assessment ("EA"), including a wildly unjustifiable "Finding of

No Significant Impact" ("FONSI").  But Defendants offered no reasonable basis to conclude that

a FONSI is appropriate for a massive commercial and residential development in a major urban

area, at the intersection of major transportation arteries and protected habitat.

8.    Defendants' FONSI was plainly a pretext for dispensing with the more rigorous

review required in an Environmental Impact Statement ("EIS") — the level of review invariably

applied to projects of the scope contemplated by the Scotts Valley application, in regions as

densely populated and environmentally sensitive as the Vallejo Site.

9.      Defendants' actions reflect a disregard for both the law and the factual record to which federal agency decisionmaking is bound.  In reaching the January 10 Decision and approving Scotts Valley's application to take land into trust for off-reservation gaming, Defendants violated the APA, IRA, IGRA, NEPA, and the trust and policy duty of the federal government to engage in consultation with interested tribes, including UAIC.

10.      Defendants' actions threaten significant and irreparable harm to UAIC's economic, social, and cultural interests, as well as UAIC's ability to protect and advance tribal sovereignty.  Defendants' actions likewise undermine and violate the trust relationship between the federal government and UAIC by uniquely disfavoring the interests of tribes, such as UAIC, that have adhered to the legal framework governing Indian gaming, the taking of land into trust, and the protection of cultural resources in traditional tribal homelands.

## II.    THE PARTIES

11.      Plaintiff UAIC is a federally recognized Indian tribe located on the Auburn Rancheria in the Sierra Nevada foothills in Placer County, California, roughly 80 miles northeast of the Vallejo Site.

12.      Defendant DOI is a cabinet-level agency of the United States.  DOI manages the affairs of Indian tribes through the BIA and is responsible for maintaining government-to-government relations with federally recognized Indian tribes, including Plaintiff, consistent with federal trust responsibilities to tribal governments.  DOI is also responsible for oversight, administration, and implementation of the Indian Gaming Regulatory Act ("IGRA") and the Indian Reorganization Act ("IRA"), and for promulgating and ensuring compliance with its regulations and internal policies.

13.     Defendant BIA is a bureau within DOI.  BIA provides services to Indian tribes and manages resources held in trust by the United States for Indian tribes.  In that role it is responsible for reviewing, processing, and complying with legal requirements relating to proposed fee-to-trust acquisitions.

14.     The Individual Defendants are:

a.      Bryan Mercier, currently exercising the delegated authority of the DOI Assistant Secretary for Indian Affairs.  Mr. Mercier discharges the duties of the Secretary with respect to IRA, IGRA, and related regulations, including Indian Lands Opinions ("ILOs").  Mr. Mercier also exercises authority over the Bureau of Indian Affairs ("BIA") and decides requests for off-reservation fee-to-trust acquisitions for gaming purposes.  Indian Affairs Manual Part 52, Chapter 15, § 1.5.  From 2021 until January 2025, the office of the Assistant Secretary for Indian Affairs was held by Bryan Newland.

b.      Scott Davis, current Principal Deputy Assistant Secretary for Indian Affairs.  From 2021 until January 2025, the office of Principal Deputy Assistant Secretary for Indian Affairs was held by Wizipan Garriott.  Wizipan Garriott signed the January 10 Decision approving the Project, in purported exercise of the delegated authority of the Assistant Secretary-Indian Affairs.  Immediately after signing the January 10 Decision, Mr. Garriott left his position at DOI.

c.      Philip Bristol, current Acting Director of the Office of Indian Gaming. The Office of Indian Gaming acts as the primary advisor within DOI on the requirements of IGRA.  From 2010 until January 2025, the Director of the Office of Indian Gaming was Paula Hart.  On information and belief, Plaintiff alleges that Ms. Hart played a primary role in drafting the 2025 ILO as part of the January 10 Decision.  Ms. Hart left her position at DOI shortly after

4

the January 10 Decision.

15.     The Individual Defendants are sued in their official capacities and are named Defendants as a result of the actions and decisions of DOI and BIA for which they bear responsibility.

## III.    JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and pursuant to 28 U.S.C. §§ 2201 and 2202.  Plaintiff seeks declaratory, injunctive, and other necessary relief against each and all Defendants as allowed by these and other applicable statutes.

17.     This Court has personal jurisdiction over Defendants because each Defendant has the requisite minimum contacts with the District of Columbia.  DOI is a federal agency established by the government of the United States.  BIA is a bureau within DOI.  Individual Defendants are sued in their official capacities with respect to DOI and BIA.

18.     The United States has waived sovereign immunity from suit under 5 U.S.C. § 702 and 28 U.S.C. § 2409a.

19.     Venue in the United States District Cout for the District of Columbia is proper under 28 U.S.C. § 1391(b)(2) and (e), and under 5 U.S.C. § 703.

## IV.    STATUTORY BACKGROUND

### A.    Administrative Procedure Act

20.     The APA provides a right of judicial review for "any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.

21.     The APA further establishes the standard for federal agency proceedings.  In particular, the statute requires that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding" and that except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e).

22.     The APA also directs that the reviewing court "shall" hold unlawful and set aside agency actions, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

**B.      Indian Reorganization Act**

23.     The IRA permits the Secretary of the Interior to take land into federal trust "for the purpose of providing land for Indians."  25 U.S.C. § 5108.  The regulations at 25 C.F.R. Part 151 ("Part 151") set forth the authorities, policy, and procedures governing the trust-acquisition process.  Additionally, BIA's "Fee-to-Trust Handbook" establishes "standard procedures used by the [BIA] for the transfer of fee land into trust for restricted status."

24.     Under both Part 151 and the Fee-to-Trust Handbook, an applicant tribe must identify the purposes for which the proposed trust property would be restored.  25 C.F.R. §§ 151.10(c), 151.11(a).[1]  Additionally, BIA must ensure proper, marketable title consistent with the proposed use.  25 C.F.R. § 151.13(b).

---

[1] Certain Part 151 regulations were revised effective January 11, 2024.  *See* 88 Fed. Reg. 86,222 (Dec. 12, 2023).  Scotts Valley's application was evaluated under the earlier regulations.  All citations to Part 151 are to the regulations in existence prior to the January 11, 2024 revision.

2890305

25.     Part 151 further requires the Secretary to consider a number of factors when reviewing a fee-to-trust application when the land is outside of and non-contiguous to a tribe's reservation.  Relevant here, these considerations include the land's "distance from the boundaries of the tribe's reservation," with "greater scrutiny [of] the tribe's justification of anticipated benefits from the acquisition" as "the distance between the tribe's reservation and the land to be acquired increases."  25 C.F.R. § 151.11(b).  BIA must also "give greater weight to the concerns raised" by "state and local governments."  25 C.F.R. § 151.11(b), (d).

26.     Finally, Part 151 requires BIA to carefully evaluate and address "jurisdictional problems and potential conflicts of land use which may arise."  25 C.F.R. §§ 151.10(f), 151.11(a), (d).

**C.    Indian Gaming Regulatory Act**

27.     IGRA establishes a regulatory structure for gaming on Indian lands in the United States.

28.     IGRA generally prohibits Indian gaming on lands acquired in trust after the statute's October 17, 1988 effective date, subject to an exception for so-called "restored lands."  25 U.S.C. § 2719(b)(1)(B)(iii).  The restored lands exception permits gaming on lands taken into trust after 1988 "as part of the restoration of lands for an Indian tribe that is restored to federal recognition."  25 U.S.C. § 2719(b)(1)(B)(iii).  DOI has promulgated rules for determining whether the restored lands exception applies at 25 C.F.R. Part 292 ("Part 292").

29.     Under the Part 292 regulations, a tribe restored to federal recognition under a court-ordered settlement agreement must demonstrate both (1) a "significant historical connection" to the specific property proposed for gaming; and (2) a "temporal connection"

between its restoration to federal recognition and its request for restored land.  25 C.F.R.
§§ 292.11(c), 292.12.

30.     To demonstrate a significant historical connection, a tribe must show either
(1) that "the land is located within the boundaries of the tribe's last reservation under a ratified or
unratified treaty"; or (2) "by historical documentation[,] the existence of the tribe's villages,
burial grounds, occupancy or subsistence use in the vicinity of the land."  25 C.F.R. § 292.2.

31.     To demonstrate the requisite temporal connection, the applicant tribe must show
that either: (1) "[t]he land is included in the tribe's first request for newly acquired lands since
the tribe was restored to Federal recognition"; or (2) "[t]he tribe submitted an application to take
the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe
is not gaming on other lands."  25 C.F.R. 292.12(c).

32.     The burden "is on the applicant tribe to establish its eligibility" for the restored
lands exception.  73 Fed. Reg. 29354, 29372 (May 20, 2008).  Accordingly, "a significant
historical connection must be based on positive evidence rather than negative inference."  *Id.*
Part 292 also "requires reliable historical documentation of use or occupancy; inferences are
insufficient to establish a significant historical connection."  Ex. B (2012 ILO) at 9-10.  A
significant historical connection cannot be based on absence of evidence.  *Id.* at 9-10.

33.     The Secretary has implemented and interpreted these regulatory requirements to
"effectuate[] IGRA's balancing of the interests of newly acknowledged and/or restored tribes
with the interests of nearby tribes and the surrounding community."  *Redding Rancheria v.
Jewell*, 776 F.3d 706, 712 (9th Cir. 2015).  The regulations strike "a balance between allowing
restored tribes to game on newly acquired lands while at the same time protecting the interests of

established tribes." *Id.* Restored tribes would otherwise gain "an unfair advantage over established tribes who generally cannot game on any lands acquired after IGRA was passed." *Id.*

### D.     National Environmental Policy Act

34.     NEPA is the country's "basic national charter for the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences and take actions that protect, restore, and enhance the environment" and to "ensure that agencies identify, consider, and disclose to the public relevant environmental information early in the process before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b), (c).

35.     To achieve these objectives, NEPA imposes "action-forcing" requirements on all federal agencies. 40 C.F.R. § 1500.1(a)(2). Chief among these is the mandate to prepare a comprehensive Environmental Impact Statement on any major action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. Part 1502.

36.     If an agency is uncertain as to whether NEPA requires preparation of an EIS, it may prepare an Environmental Assessment. 40 C.F.R. § 1501.5(a). An EA must discuss the purpose and need for the proposed action, the proposed action's potential environmental impact, and reasonable alternatives to the proposed action. 40 C.F.R. § 1501.5(c)(2).

37.     If the EA establishes that the proposed action will not have any significant environmental impacts, the agency must prepare a Finding of No Significant Impact. 40 C.F.R. § 1501.6(a)(1), (2). If the EA reveals that the proposed action will *or may* significantly impact the human environment, the agency must prepare an EIS. Indian Affairs National Environmental Policy Act Guidebook, 59 IAM 3-H (August 2012) ("BIA NEPA Guidebook") § 6.5.

38.     NEPA broadly defines "environment" to include "the natural and physical environment and the relationship of present and future generations with that environment."  40 C.F.R. § 1508.1(r).  Impacts to the environment include direct, indirect, and cumulative effects and ecological, historic, cultural, economic, social, or health impacts.  40 C.F.R. § 1508.1(i).  This includes effects on ecological, cultural, and socioeconomic resources of tribal importance.  *Id*.

39.     In determining the significance of a proposed action's environmental impacts, the agency must consider multiple significance criteria, including the degree to which the action may adversely affect unique characteristics of the geographic area such as historic or cultural resources, tribal sacred sites, wetlands, or ecologically critical areas; whether the action may conflict with federal, state, tribal or local law or requirements designed for the protection of the environment; the degree to which the potential effects on the human environment are highly uncertain; the degree to which resources listed in or eligible for listing in the National Register of Historic Places may be adversely affected; the degree to which the action may adversely affect an endangered or threatened species or the habitat of such a species; and the degree to which the action may adversely affect rights of Tribal Nations.  40 C.F.R. § 1501.3(d)(2).

40.     NEPA provides potentially affected tribal governments with special rights and protections.  For example, relevant implementing regulations and procedures require Defendants to incorporate Indigenous Knowledge in their EAs.  40 C.F.R. § 1506.6(b).  Indigenous Knowledge is among the forms of high-quality information that must be used in identifying and evaluating a proposed action's environmental impacts.  40 C.F.R. §§ 1501.8(a), 1502.15(b), 1506.6(b).

2890305

41.     Regulations and agency procedures also direct that tribal governments with special expertise should be accorded an enhanced role in the NEPA process as "cooperating agencies."  *See* 40 C.F.R. § 1501.8; 43 C.F.R. §§ 46.225, 46.230; BIA NEPA Guidebook § 8.2.3.

42.     In addition, when a tribe has special expertise or will be impacted by the proposed action, that tribe must be consulted in the preparation of the lead agency's NEPA document.  40 C.F.R. § 1501.9; 43 C.F.R. § 46.230; BIA NEPA Guidebook § 6.4.7; Department of the Interior Procedures for Managing the NEPA Process, 516 DM 10, 10.3(A)(2)(a).  The agency must also provide public notice of NEPA-related opportunities for public engagement, in order "to inform those persons and agencies who may be interested or affected by their proposed actions."  40 C.F.R. § 1501.9(c)(5).

**E.     Tribal Consultation**

43.     As a part of its "solemn promises to Tribal nations," the United States government has "charge[d] all executive departments and agencies with engaging in regular, meaningful, and robust consultation with Tribal officials in the development of Federal policies that have Tribal implications."  86 Fed. Reg. 7491 (Jan. 29, 2021).

44.     Federal Executive Order 13175 memorializes a policy "to establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications."  65 Fed. Reg. 67249 (Nov. 9, 2000).  The term "Federal policies that have tribal implications" includes "any actions that have substantial direct effects on one or more Indian tribes."  *Id.*

45.     Additionally, the federal government has established a set of uniform standards for tribal consultation.  87 Fed. Reg. 74479 (Dec. 5, 2022).  These standards provide that "[w]hen a Tribal government requests consultation," the agency "shall" respond "within a

11

reasonable time period." *Id.* at 74480.  These standards further direct that tribal parties be notified and provided with relevant materials well in advance of consultation, and that the heads of federal agencies timely disclose to any affected tribe the outcome of the consultation and the decisions made as a result. *Id.* at 74480-81.

46.    DOI has adopted its own procedures requiring consultation with federally recognized Indian tribes.  Those procedures declare a commitment to (1) "invite Tribes to consult on a government-to-government basis whenever there is a Departmental Action with Tribal Implications"; (2) "make good-faith efforts to invite Tribes to consult early in the planning process"; (3) "engage in robust, interactive, pre-decisional, informative, and transparent consultation when planning actions with Tribal implications"; and (4) "seek consensus with impacted Tribes in accordance with the Consensus-Seeking Model."  Department of the Interior Policy on Consultation with Indian Tribes and Alaska Native Corporations, 512 DM 4, § 4.4.

47.    DOI procedures likewise state that the agency "must invite Indian Tribes early in the planning process to consult whenever a Departmental . . . action with Tribal Implications arises," and instruct that the agency "should operate under the assumption that all actions with land or resource use or resource impacts may have Tribal implications."  Department of the Interior Procedures for Consultation with Indian Tribes, 512 DM 5, 5.4(A).  DOI procedures specifically require the agency to "extend consultation invitations" in accordance with this guidance. *Id.*

48.    DOI procedures also mandate tribal consultation specifically in the context of NEPA review.  "When BIA determines that Tribal governments could be affected by a proposed action, Tribal governments are to be consulted during the preparation of environmental documents and, at their option, may cooperate in the review or preparation of such documents."

Department of the Interior Procedures for Managing the NEPA Process, 516 DM 10, 10.3(A)(2)(a).

49.    In establishing these policies and its commitment to consultation with Indian tribes, the federal government has "created a justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views." *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979).  The government's failure to comply with its articulated consultation policies "not only violates those general principles which govern administrative decisonmaking, but also violates the distinctive obligation of trust incumbent upon the Government in its dealings" with the Indian tribes.  *Id.* (alterations omitted).

## V.    FACTUAL BACKGROUND

### A.    The Tribes

#### 1.    UAIC

50.    The United Auburn Indian Community is comprised of members from several tribes located in and around Placer County, California.  UAIC is primarily comprised of members from the Nisenan, Northern Sierra Miwok, and Valley Miwok tribes.  The Nisenan are a part of the Maidu people, which include additional tribes located in the Sierra Nevada.  The Northern Sierra Miwok and Valley Miwok are part of the Miwok people, which include additional tribes located elsewhere in the Sierra Nevada, in the northern part of the San Francisco Bay Area, and in Lake County.

51.    UAIC's traditional lands include territory in the Sierra Nevada foothills and the southern Sacramento Valley.

52.    UAIC owns and operates the Thunder Valley Casino in Placer County.

53.    In 1917, the Auburn Band received land in trust from the United States near the City of Auburn and formally established a reservation, known as the Auburn Rancheria.

54.    In 1953, Congress enacted the Rancheria Acts, which authorized the termination of federal trust responsibilities to a number of California tribes, including the Auburn Band. Besides a 2.8-acre parcel containing a tribal church and a park, the government sold the Auburn Rancheria.  The government terminated federal recognition of UAIC in 1967.

55.    In 1991, surviving members of the Auburn Band reorganized their tribal government as the UAIC and requested that the United States formally restore their federal recognition.  Congress restored the tribe's recognition in 1994 with the passage of the Auburn Indian Restoration Act, which also permitted the tribe to acquire land in Placer County, California, to establish a new reservation.

56.    In the years since, UAIC has applied for and received approval for gaming on its traditional land pursuant to IGRA.  In 1999, the tribe and the State of California entered into a Tribal-State Compact, enabling UAIC to conduct Class III gaming on its reservation.

**2.    Scotts Valley Band**

57.    The Scotts Valley Band of Pomo Indians, previously known as the Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, is a federally recognized tribe of Pomo Indians based in Lake County.

58.    Scotts Valley's traditional lands are in Lake County, California, roughly 100 driving miles from the Vallejo Site.  In 1851, the ancestors of Scotts Valley signed a treaty with the United States at Clear Lake.  This treaty was not ratified by the U.S. Senate.  In 1907, the United States created a reservation for Scotts Valley at Clear Lake.  Scotts Valley citizens later

voted to terminate their Clear Lake reservation and in return received property at Clear Lake in fee simple.

59.    In 1911, the United States acquired a parcel of land for Scotts Valley known as the Sugar Bowl Rancheria. Scotts Valley held that land until 1958, when Congress enacted the California Rancheria Termination Act, which terminated both the federal trust relationship with the tribe as well as the reservation status of the Sugar Bowl Rancheria. After litigation in the wake of that termination, Scotts Valley entered into a settlement agreement under which the United States reinstated Scotts Valley's status as a federally recognized tribe. This settlement agreement was executed on March 15, 1991. Public notice of the reinstatement was later provided in the Federal Register, with a purported effective date of September 6, 1991. 57 Fed. Reg. 5214 (Feb. 12, 1992).

60.    Scotts Valley continued to be based at Clear Lake. Scotts Valley owns multiple properties at and around Clear Lake, including a parcel Scotts Valley describes as its "tribal lands," at which it hosts tribal events and ceremonies. Scotts Valley also owns multiple businesses headquartered at Clear Lake, and it has sought and obtained state and federal funding for those businesses to support activities in and around the area.

61.    The Vallejo Site is not within Scotts Valley's homeland. The Vallejo Site lies within the ancestral lands of the Patwin people. It is widely understood, including by Scotts Valley itself, that the City of Vallejo and surrounding lands are within the traditional homeland of the Patwin people, who are unrelated to Scotts Valley and to the Pomo people to which Scotts Valley belongs. Scotts Valley has conceded that it has no historical documentation placing its ancestors at Rancho Suscol, the 84,000-acre (130 square-mile) ranch that historically surrounded the Vallejo Site.

62.     Since it was reinstated, nothing has prevented Scotts Valley from submitting a fee-to-trust application for land within its traditional homeland.  Scotts Valley has instead pursued multiple sites well outside its traditional homeland because of their greater moneymaking potential, closer to potential gambling markets along major freeways in the heart of the San Fransico Bay Area.

**B.     Scotts Valley's application for the distant, ahistorical Richmond Site is rightly rejected.**

63.     In 2005, Scotts Valley sought land in Richmond, California — a large city in the San Francisco Bay Area — as part of its plan to develop a 225,000 square-foot casino, complete with a 79,320 square-foot gaming floor.

64.     In seeking a "restored lands" determination for the Richmond Site, Scotts Valley falsely asserted a significant historical connection as a supposed successor to the Suisun Patwin tribe.  Scotts Valley acknowledged that the Suisun Patwin tribe used and occupied Vallejo.  In reality, Scotts Valley has no connection to the Suisun Patwin tribe or to any Patwin tribe.

65.     In 2012, DOI denied Scotts Valley's "restored lands" request for the Richmond site.  Among other shortcomings, DOI found that Scotts Valley lacked a historic connection to Richmond.  *See* Ex. B at 5-18.  DOI also found no evidence suggesting Scotts Valley was a successor to the Suisun Patwin tribe.  *Id.* at 10-13, 17.  Scotts Valley did not appeal DOI's decision.

**C.     Scotts Valley's application for the distant, ahistorical Vallejo Site is rightly rejected.**

66.     After abandoning its meritless application for "restored lands" in Richmond, Scotts Valley shifted its focus to another large Bay Area city outside its traditional homelands — the City of Vallejo, just to the northeast.  Specifically, Scotts Valley sought a "restored lands"

determination for a 128-acre parcel of land in Vallejo (the "Western Parcel"), which now represents the westernmost of the four parcels that make up the Vallejo Site. The Western Parcel was the only parcel for which Scotts Valley sought a restored lands determination in 2016.

67. Scotts Valley's 2016 restored lands request claimed a significant historical connection to the Western Parcel based on: (1) an unratified 1851 treaty signed by members of multiple regional tribes, including some Scotts Valley ancestors; and (2) allegations that some Scotts Valley ancestors were forced laborers on ranches owned by the family of General Mariano Vallejo during the Mexican administration of California.

68. Numerous Indian tribes opposed Scotts Valley's request, including UAIC. The tribes, the County of Solano, the City of Vallejo, and others submitted evidence rebutting Scotts Valley's application, including Scotts Valley's assertion of a significant historical connection at the Vallejo Site.

69. In August 2016, UAIC wrote to BIA pointing out the request's many flaws. UAIC noted that the parcel in question was within the aboriginal territory of the Yocha Dehe and other Patwin-descended tribes, that the parcel was located more than a 90-mile drive from the homeland of Scotts Valley in Clear Lake, and that scholars had never been able to establish a significant historical connection between Scotts Valley and Vallejo. A favorable ruling for Scotts Valley, UAIC stressed, "would nullify the meaning of aboriginal lands." UAIC further noted that, as a nearby Indian tribe affected by Scotts Valley's application and proposed gaming operations, UAIC expected to be consulted consistent with Defendants' trust and policy obligations.

70. In December 2016, DOI concluded that it could not approve Scotts Valley's application, as it lacked evidence of a significant historical connection to Vallejo. In response,

17

Scotts Valley requested an opportunity to search for additional evidence.  More than a year later, Scotts Valley submitted material purporting to support a historical connection to the Vallejo Site. This material included claims that certain Scotts Valley ancestors were baptized at the Sonoma Mission in 1837 (outside the Vallejo area).  The material focused in particular on one purported Scotts Valley ancestor, Shuk Augustine, supposedly living in the city of Napa, California as of the 1870 Census (also outside the Vallejo area).

71.     After careful review of Scotts Valley's newly submitted materials, DOI determined that Scotts Valley had not shown the requisite historical connection to the land.  *See* Ex. C.

**D.     Scotts Valley litigates its rejected Vallejo application.**

72.     Having failed to prove a significant historical connection to the distant Vallejo Site, Scotts Valley sued, seeking to invalidate both the 2019 ILO and the regulations in 25 C.F.R. Part 292.

73.     The district court ultimately upheld Part 292 and found the 2019 ILO was not arbitrary or capricious.  However, the court remanded the case to DOI for consideration of whether the "Indian canon of construction" — a principle of statutory interpretation which calls for ambiguous provisions to be interpreted in favor of Indians — should be applied in favor of Scotts Valley.  *Scotts Valley Band of Pomo Indians v. U.S. Dep't of the Interior*, 633 F. Supp. 3d 132, 171 (D.D.C. 2022).  The court did not address the anomaly that would result if DOI opted to apply the Indian canon in this context — effectively using the canon to favor the interests of one tribe while *disfavoring* the interests of all opposed tribes, including the Patwin tribes whose traditional homelands actually encompass the Vallejo Site.

74.     The district court denied DOI's subsequent motion for reconsideration.  In doing so, the court clarified that it did not conclude the Indian canon *should* be applied, nor did the court dictate the ultimate resolution of Scotts Valley's restored lands request.  The court explicitly noted that it "didn't rule that [DOI] had to apply the [canon]."  The United States elected not to follow through with an appeal of the district court decision, effectively causing proceedings to be remanded back to DOI.

**E.     Defendants revisit the rejection, excluding UAIC and its evidence from the process.**

75.     DOI's historical practice on remand is to establish a schedule for interested parties to participate in proceedings.  Defendants departed form that standard practice here.  With the request back before DOI on remand, in November 2023 Yocha Dehe wrote to DOI to formally request that the Department establish a fair, transparent, and fact-based process in which all interested parties could participate.  Defendants did not respond to that letter.

76.     UAIC and numerous other tribes submitted additional letters after remand reiterating their position on the Scotts Valley application, asking to provide additional evidence rebutting Scotts Valley's assertions, and objecting to their exclusion from the process to date. Defendants did not respond to any tribe's outreach.

**F.     Defendants rush to approve the Vallejo Site before a change of administration — flouting procedure, dispensing with proper environmental review, and ignoring UAIC's requests to consult.**

77.     In June 2024, UAIC discovered that DOI, having ignored the requests of concerned tribes and without informing UAIC or any other tribe, had issued a memorandum directing BIA to complete Scotts Valley's fee-to-trust process and related environmental review. In the weeks that followed, DOI continued to ignore tribal requests for information and fair process.

19

78.    On July 5, 2024, UAIC and other tribes received notice (pursuant to Part 151) of a deadline to review and submit comments on Scotts Valley's fee-to-trust application.  The notice informed the tribes that they could obtain the application from the agency's Pacific Regional Office.  But when tribes reached out to that office as instructed, they were stonewalled.  BIA did not provide tribes with confirmation of the scope and contents of Scotts Valley's application until August 19, 2024 — just seven days before the comment deadline.

79.    On July 8, 2024, Defendants summarily issued to the public an EA finding that the Scotts Valley project — a 615,000 square-foot casino, office building, and residences, in a major metropolitan area along major freeways, adjacent to protected habitat and open space — would have no significant environmental impacts.  Defendants also disclosed for the first time in the EA that the project was not limited to the 128-acre Western Parcel, but also involved three additional parcels (the "Eastern Parcels").

80.    Defendants did not notify or consult UAIC in preparing the EA.  Despite this lack of notice, Defendants provided less than 45 days to review and comment on thousands of pages of technical and scientific documents purporting to support Defendants' finding that the project was unlikely to have any significant environmental impact.

81.    In a July 30, 2024 letter to BIA, UAIC again objected that it had not been consulted or informed about the reconsideration of the Scotts Valley application and had been denied a reasonable opportunity to participate in the related Environmental Assessment.  UAIC urged BIA to extend the comment period.  As the UAIC reminded BIA, "[t]his lack of consultation . . . is completely inconsistent with the current policy in the Department Manual, which requires [BIA] to consult with tribal governments "during the preparation of environmental documents."  UAIC further pointed out that the lack of consultation was also in

violation with general DOI consultation procedures, which require the Department to "consult with Tribes when Departmental Actions with Tribal Implications affect Tribe's traditional homelands."

82.    In an August 20, 2024 letter to BIA, UAIC again objected to the flaws in Scotts Valley's restored lands application.  As UAIC noted, Defendants had previously rejected the Vallejo site, and "[n]othing has changed regarding whether this off-reservation casino proposal qualifies for the restored lands exception under the Indian Gaming Regulatory Act."  As UAIC noted, although DOI "must conduct a new analysis" on remand, that analysis must "still honor[] the facts."  UAIC also reiterated that BIA had ignored its polices and procedures regarding tribal consultation.  In particular, DOI was still refusing requests to consult with tribes.  And DOI denied tribes and the public adequate time to comment in connection with the Environmental Assessment.

83.    Additionally, UAIC observed that issuing a FONSI in a project of this scale was not only unjustified, but inconsistent with agency practice.  Defendants reviewed numerous large-scale off-reservation fee-to-trust land applications in California, all of which — except the Scotts Valley application — were subject to an EIS.

84.    In the months that followed, tribes submitted hundreds of pages of evidence further rebutting Scotts Valley's "restored lands" claims.  Yocha Dehe, for instance, offered extensive expert analysis and ethnohistorical documentation demonstrating that Scotts Valley never used or occupied — and therefore lacked any significant historical connection to — the Vallejo Site.  Solano County also provided extensive evidence disproving the assertions in Scotts Valley's application.

85. This evidence precludes Scotts Valley's claims of a significant historical connection to the Vallejo Site. For example:

a. Scotts Valley falsely claimed that the Patwin people native to the Vallejo area were "replaced" by Pomo people after being decimated by smallpox in the 1830s. Extensive evidence demonstrates otherwise. The Patwin people continued to occupy the Vallejo area long after this time, and were never "replaced" by Scotts Valley, which continues to be based in Lake County.

b. Scotts Valley falsely claimed that a record of baptisms at Sonoma Mission demonstrated a Vallejo presence. In reality, Scotts Valley presented no evidence of ties between the two, and the record reflected that those baptized were connected to tribes even further from the Vallejo area than the already-distant Sonoma Mission.

c. Scotts Valley falsely claimed that tribal ancestors worked on ranches in the Vallejo area during the Mexican administration of California. Extensive evidence, including sworn testimony accepted in prior legal proceedings, demonstrates that these ranches were staffed exclusively by the Mexican military.

d. Scotts Valley falsely claimed that a single purported ancestor recorded in Napa, California — Shuk Augustine — indicates a tribal presence in the Vallejo area. But there is no evidence of this individual in the relevant census. There is no information tying this individual to the Vallejo area. And all evidence confirms that, even if the presence of this individual were substantiated, *the Vallejo area was still Patwin territory*, not Pomo. No evidence reflects a Pomo *tribal* presence in the relevant area, even on the unsubstantiated premise advanced by Scotts Valley as to a single individual. Scotts Valley has acknowledged as much on multiple occasions, describing the Vallejo area as Patwin and not Pomo.

22

86.     On information and belief, on November 22, 2024, members of several other tribes received an invitation from the Office of Indian Gaming to a group videoconference on November 27 — the day before Thanksgiving, on which many tribal governments were closed. The letter did not specify who else had received an invitation.  The stated purpose of the meeting was to discuss DOI's application of IGRA and its implementing regulations.

87.     Despite UAIC's active and ongoing efforts to participate in the review of Scotts Valley's application, Defendants did not invite UAIC to this videoconference.  UAIC did not become aware of it until weeks later.

88.     On information and belief, representatives of at least six federal recognized tribal governments attended the videoconference on November 27.  Attendees included Patwin and separate Pomo tribes; gaming and non-gaming tribes; and terminated and un-terminated tribes. Every one of the attending tribes expressed strong opposition to Scotts Valley's restored lands request and significant concerns about DOI's decisionmaking process.

89.     UAIC wrote to DOI on January 7, 2025, after hearing about the November 27, 2024 videoconference.  UAIC expressed its frustration that it was excluded from the hastily convened meeting on the Scotts Valley application, despite UAIC's longstanding, demonstrated interest in the outcome.  UAIC also reiterated its view that DOI had repeatedly failed to comply with its own tribal consultation processes, including with respect to environmental review.

**G.     Defendants approve the Vallejo site in violation of the law, and without consulting with or considering evidence from UAIC.**

90.      On January 10, 2025, DOI approved the Scotts Valley application in a written ILO.  This 2025 ILO is a final agency action for purposes of the APA.

91.     Reversing the Scotts Valley decisions issued previously, DOI concluded in the 2025 ILO that Scotts Valley's ancestors occupied the vicinity of the Vallejo Site, and that Scotts

Valley satisfied the other requirements of the restored lands exception.  DOI expressly stated that it did not consider any of the new evidence submitted by interested tribes.

92.     Specifically, DOI concluded in the 2025 ILO, on the same record that previously showed no historical connection to the Vallejo Site, that Scotts Valley's alleged occupancy in 1837 (at the Sonoma Mission) and 1870 (near Napa) was in the vicinity of the Vallejo Site.  DOI provided no reasoned explanation for this conclusion, for the change in DOI's position, or DOI's refusal to consider the contrary evidence.

93.     In addition to an ILO, DOI also included a six-page section titled "Part 151 Analysis."  The Part 151 Analysis did not address tribal comments on the Notice of Application. Moreover, the Part 151 Analysis purported to authorize a development significantly more extensive than any of the alternatives disclosed and evaluated in the EA.

## H.     Defendants acted in bad faith and engaged in improper behavior in arriving at their final decision.

94.     Defendants' actions and failures to act in this matter strongly suggest bad faith and improper behavior.  *See Esch v. Yeutter*, 876 F.2d 976, 991-93 (D.C. Cir. 1989).  For example:

a.     Defendants repeatedly ignored tribal requests for consultation.

b.     Defendants promised to consider new evidence submitted by interested tribes, then refused to consider that evidence.  Defendants then reached a conclusion completely opposite to their prior two conclusions, when reviewing the same record.

c.     On information and belief, between July 2024 and January 2025, Defendants repeatedly and falsely represented that they were in ongoing consultations with Indian tribes while, at the same time, refusing to actually consult with those tribes.

d.      On information and belief, during the November 27 videoconference, tribal leaders asked for information about the status of the environmental review process.  In response, then-Director of the Office of Indian Gaming Paula Hart falsely stated that the process was "beyond" regulatory time limits, such that an imminent decision on Scotts Valley's Project was legally required.  The statement was both false and misleading.  The environmental review process was not "beyond" any regulatory time limits, and Defendants had discretion to extend any such time limits if needed.

e.      On information and belief, DOI representatives falsely represented to concerned federal elected officials that the 2019 district court decision, *see supra* section V.D, required DOI to approve Scotts Valley's restored lands request, despite the district court stating exactly the opposite in response to the DOI's motion for reconsideration.

## I.      Approval of the Vallejo Site threatens immense, irreparable harm to UAIC.

95.      Scotts Valley proposes a sprawling casino development at the Vallejo Site that will have significant negative impacts on UAIC.

96.      In particular, Scotts Valley's proposed casino development will have significant negative impact on UAIC's ability to sustain itself economically, culturally, and socially.  The development threatens UAIC's ability to sustain much of the programming it offers to tribal members.  For example, UAIC operates a care program for tribal elders, nutritional programs, after-school tutoring, financial literacy and GED support classes, community events, and language and culture programming.  These services support the immediate and long-term needs of tribal members.  And they also support UAIC's broader interests in preserving and advancing tribal culture, identity, and sovereignty.  UAIC is able to fund these services in significant part through the operation of its Thunder Valley Casino, which UAIC operates on its own traditional

homelands, pursuant to the proper application of the relevant federal statutes and subject to a State-Tribal compact.

97.    The proposed development likewise threatens a significant source of the funds that support UAIC's self-government.  The development is therefore also a threat not only to UAIC's ability to provide services and support to tribal members, but also to UAIC's ability to maintain effective tribal sovereignty.

98.    The proposed development also poses a threat to the accepted system of Indian gaming regulation, which UAIC and other tribes have relied on when making investments in their own gaming resources.  UAIC and other tribes have made significant investments in gaming resources that are consistent with the location of their tribal homelands, and therefore outside major urban centers.  Defendants are now opening the door to a major urban gaming operation by a tribe with no significant connection to the land in question, undermining the investments of tribes reasonably relying on the fair application of the law.

99.    Finally, Defendants' actions put the federal government in jeopardy of violating its trust obligations to tribes and their lands, including UAIC.  Defendants' actions threaten UAIC's and other tribes' reasonable expectation that the federal government, consistent with its trust obligations, will take action to protect a tribe's interest in its traditional homelands and its cultural and historical resources, and will not unjustifiably favor the interests of one tribe over those of numerous others.

///

2890305

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706
### (Indian Reorganization Act, 25 C.F.R. Part 151)

100.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

101.    Part 151 requires BIA to ensure the applicant tribe has identified the purposes for which the proposed trust property would be used.  25 C.F.R. §§ 151.10(c), 151.11(a).  The regulations further mandate that BIA ensure proper, marketable title consistent with the proposed use.  25 C.F.R. § 151.13(b).

102.    Scotts Valley's fee-to-trust application failed to disclose proposed uses for three of the four parcels within the Vallejo Site.  Neither Scotts Valley's fee-to-trust application nor Defendants' decision to grant that application was consistent with the proposed action evaluated in the EA.

103.    Part 151 requires BIA to carefully evaluate "jurisdictional conflicts and potential conflicts of land use which may arise."  25 C.F.R. §§ 151.10(f), 151.11(a), (d).

104.    Scotts Valley's proposed use of the Vallejo Site conflicts with easements and rights-of-way legally limiting permissible uses of the Vallejo Site.  Scotts Valley's proposed use of the Vallejo Site would place a 600,000 square-foot casino on an ecologically sensitive property that is part of an area set aside as open space under land-use plans and zoning codes.

105.    Placing the Vallejo Site in trust for Scotts Valley also threatens to strip Yocha Dehe and Kletsel Dehe of their rights under California laws governing appropriate treatment of tribal cultural resources.  In fee status, the Vallejo Site is subject to California laws giving culturally affiliated Patwin tribes a primary role in determining cultural resource treatment.  Cal.

Pub. Res. Code §§ 5097.9-5097.98; Cal. Health & Safety Code § 7050.5.  In trust status, the

Vallejo Site is subject to federal laws giving Scotts Valley, a Pomo tribe lacking cultural

affiliation, authority over Patwin cultural resources.  *See* 43 C.F.R. § 10.7.  BIA's decision to

acquire the Vallejo Site in trust for Scotts Valley fails to address these issues.

106.    Part 151 requires consideration of the distance between the applicant tribe's

existing lands and the proposed trust property, with "greater scrutiny" applicable as that distance

increases.  *See* 25 C.F.R. § 151.11(b).  Defendants admitted the Vallejo Site is distant from

Scotts Valley's aboriginal lands and its prior reservation, but they nonetheless failed to apply the

"greater scrutiny" standard.

107.    Part 151 requires BIA to "give greater weight to the concerns raised" by "state

and local governments."  25 C.F.R. § 151.11(b), (d).  Defendants failed to apply this standard or

to engage in this exercise, despite the stated concerns of state and local governments.

108.    Defendants' decision to approve the Project was therefore arbitrary, capricious, an

abuse of discretion, and contrary to the IRA and Part 151.

**SECOND CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706**
**(Indian Gaming Regulatory Act, 25 C.F.R. Part 292)**

109.    Plaintiff incorporates by reference all previous paragraphs as though fully set

forth herein.

110.    Defendants' 2025 ILO arbitrarily and capriciously concluded that Scotts Valley

met all applicable requirements of the restored lands exception for the entirety of the Vallejo

Site.  Defendants arbitrarily and capriciously refused to consider relevant evidence and erred in

their application of the restored lands exception's "significant historical connection" and

"temporal connection" requirements.

A.    **Significant Historical Connection Determination**

111.    To qualify for the restored lands exception, Scotts Valley was required to demonstrate a "significant historical connection" to the land, in the form of historical documentation showing the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land.  25 C.F.R. §§ 292.2, 292.12.

1.    **Tribal Occupancy**

112.    Defendants failed to comply with Part 292 and arbitrarily and capriciously departed from settled precedent and their own prior interpretations of the restored lands exception in finding that Scotts Valley "occupied" the vicinity of the Vallejo Site.  Specifically, the 2025 ILO reinterprets "occupancy" to include an "inconsistent" or "unsettled" presence. Defendants did not properly acknowledge or reasonably explain this reinterpretation, in violation of IGRA and the APA.

113.    Defendants' new definition of "occupancy" also lacks any reasonable basis and was arbitrarily and capriciously applied.  Evidence submitted by Plaintiff and other tribes and interested parties, and ignored by DOI, fatally undermines Scotts Valley's assertion of occupancy.  The 2025 ILO does not account for or mention this evidence.

2.    **Vicinity to the Vallejo Site**

114.    The term "vicinity" means "the particular location and circumstances of available direct evidence . . . cause a natural inference that the [applicant] tribe historically used or occupied the subject parcel" to be "restored."  *See* Ex. B at 15.  The term does not "expand 'restored land' beyond land that was historically used or occupied by a tribe."  *Id*.  Instead, the applicant tribe must demonstrate that its use and occupancy of nearby parcels shows "that the

tribe also made use of the parcel in question." *Confederated Tribes of the Grand Ronde Cmty. v. Jewell*, 830 F.3d 552, 566 (D.C. Cir. 2016).

115.    Reversing its own prior conclusion on the same record, the 2025 ILO found that Scotts Valley demonstrated occupancy in the vicinity of the Vallejo Site.  The purported bases for that finding are contradicted by the record, as reflected DOI's initial rejection of Scotts Valley's application.  They are further contradicted by the conclusive evidence submitted by interested tribes, which Defendants refused to consider or evaluate.  There is no reasonable basis to conclude that Scotts Valley, which has previously described Vallejo as Patwin and not Pomo traditional homelands, demonstrated occupancy in the vicinity of the Vallejo Site.  Defendants' conclusion was arbitrary and capricious, an abuse of discretion, and contrary to law.

**B.    Temporal Connection Determination**

116.    To satisfy the temporal connection requirement, Scotts Valley needed to show either that: (a) the land proposed to be "restored" is included in the tribe's first request for newly acquired lands since the tribe was restored to federal recognition; or (b) the tribe submitted an application to take the land into trust within 25 years after the tribe was restored to federal recognition and the tribe is not gaming on other lands.  25 C.F.R. § 292.12.

117.    The Vallejo Site consists of four parcels.  Scotts Valley requested only one of the four parcels — the Western Parcel — to be taken into trust in August 2016.  Scotts Valley did not submit any request with respect to the remainder of the Vallejo Site until 2024, when it separately requested that the three additional parcels — the Eastern Parcels — be taken into trust. The 2024 request referred to the three additional Eastern Parcels as "necessary" for the Project.

118.    Scotts Valley filed its fee-to-trust application for the Western Parcel more than 25 years after the date of the settlement agreement causing Scotts Valley to be restored to federal recognition.  Scotts Valley filed its fee-to-trust application for the three "necessary" Eastern Parcels even later — well over 25 years after the settlement agreement *and* the subsequent Federal Register notice regarding Scotts Valley's restoration.

119.    The 2025 ILO nonetheless found the entire Vallejo Site — all four parcels — satisfies the temporal connection requirement.  That finding was arbitrary, capricious, an abuse of discretion, and contrary to law.

### C.    Refusal to Consider Relevant Evidence

120.    On remand, Defendants were charged with considering whether Scotts Valley met the requirements of Part 292, including the "significant historical connection" and "temporal connection" requirements.

121.    Tribes and concerned stakeholders timely placed before relevant DOI decisionmakers substantial evidence directly relevant to these issues.  That evidence conclusively rebutted Scotts Valley's restored lands claims.

122.    Defendants ignored that evidence in the 2025 ILO, nothing that the Department "neither solicited nor considered any additional evidentiary materials from outside parties, including the Band and those opposed to the Band's request."

123.    Defendants' refusal to consider relevant evidence timely placed before DOI was arbitrary and capricious and an abuse of discretion, in addition to evidence of bad faith, in violation of the Administrative Procedure Act.

///

31

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706
### (National Environmental Policy Act, 42 U.S.C. § 4332 and 40 C.F.R. Parts 1500-1502)

124.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

125.    NEPA requires that, for any proposed action that will or may have significant impacts, a comprehensive EIS must be prepared.  42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. Part 1502.  If an agency is uncertain as to whether an EIS is required, it may prepare an EA.  40 C.F.R. § 1501.5(a).  Only if the EA establishes that the proposed action will not have any significant environmental impacts may the agency prepare a FONSI and dispense with an EIS.  40 C.F.R. § 1501.6(a)(1), (2).  If the EA reveals that the proposed action will or may significantly impact the human environment, an EIS must be prepared.  BIA NEPA Guidebook § 6.5.

126.    In evaluating the significance of a proposed action's environmental impacts, federal agencies must consider multiple significance criteria.  These criteria include, but are not limited to, the following:  adverse impacts on historic or cultural resources, tribal sacred sites, wetlands, or ecologically critical areas; inconsistency with state, tribal, or local environmental requirements; adverse effects on threatened or endangered species or their habitats; potential impacts on the rights of tribal nations; and the extent to which potential impacts may be uncertain or unknown.  40 C.F.R. § 1501.3(d)(2).

127.    Defendants failed to adequately consider these significance criteria in preparing the EA and concluding that the project would have no significant environmental impact.

2890305

128.    Defendants also erred by failing to consider all reasonably foreseeable effects of the project, including water infrastructure relocation, traffic disruptions and associated emissions, and flora and fauna displacement.

129.    Defendants' decision not to prepare an EIS for the project departed from the NEPA standard applied to numerous, similarly situated large, off-reservation casino projects.

130.    When a tribe has special expertise or will be impacted by a proposed action, the tribe must be consulted in the preparation of the lead agency's NEPA document.  40 C.F.R. § 1501.9; 43 C.F.R. § 46.230; BIA NEPA Guidebook § 6.4.7; Department of the Interior Procedures for Managing the NEPA Process, 516 DM 10, 10.3(A)(2)(a).  Despite multiple requests to be consulted as an affected tribe, and despite years of demonstrated interest in the Scotts Valley application, Defendants ignored Plaintiff's request for consultation.

131.    Defendants' decision to issue a FONSI and failure to consult with Plaintiff were arbitrary and capricious, an abuse of discretion, and contrary to NEPA and related regulations and agency policies and guidelines.

**FOURTH CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 555**

132.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

133.    The APA requires "a brief statement of the grounds for denial" when a federal agency denies an interested party's request.  5 U.S.C. § 555(e); *see also Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

134.    During the administrative proceedings for the Scotts Valley Project, UAIC repeatedly requested government-to-government consultation with Defendants, including in several letters leading up to the January 10 Decision.  UAIC also specifically requested

33

consultation in connection with DOI's NEPA analysis and its Environmental Assessment. And UAIC specifically requested that Defendants consider the additional material UAIC and other tribes submitted in opposition to the contentions in Scotts Valley's application.

135.    Defendants never engaged in consultation with UAIC, including in the context of environmental review. Nor did Defendants provide any statement of the grounds for denying UAIC's consultation requests and UAIC's requests for review of materials submitted in opposition to Scotts Valley's application.

**FIFTH CLAIM FOR RELIEF**
**Policy and Trust Obligation to Consult with Interested Tribe**

136.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

137.    Defendants are required to consult with tribes potentially affected by their decisions under both the federal government's trust duty to the tribes and under enforceable internal policies and guidelines. 512 DM 4, § 4.4; 512 DM 5, 5.4(A); 516 DM 10, 10.3(A)(2)(a); *Oglala Sioux Tribe*, 603 F.2d at 721.

138.    In establishing these policies and its commitment to consultation with Indian tribes, the federal government created a justified expectation on the part of UAIC that they would be given a meaningful opportunity to express their views.

139.    In ignoring UAIC's repeated requests for consultation, Defendants failed to comply with their articulated consultation policies and thereby acted arbitrarily and capriciously in violation of the APA, in addition to violating their trust obligations.

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court provide relief as follows:

1.      Declare that Defendants' January 10 Decision approving the Project violates the APA, IRA, IGRA, NEPA, and Defendants' tribal consultation obligations.

2.      Set aside and vacate the January 10 Decision and all related approvals, including the EA, FONSI, and ILO, and any related findings, and remand for further consideration.

3.      Enjoin Defendants and their officers, administrators, agents, employees, and those in active concert or participation with them, from authorizing Project construction or operation until further compliance with the APA, IRA, IGRA, NEPA, and Defendants' tribal consultation obligations have been completed.

4.      Award Plaintiff its reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412 and 54 U.S.C. § 307105.

5.      Grant Plaintiff such other and further temporary, preliminary, and permanent relief as the Court may deem just and proper.

///

2890305

Respectfully submitted,

Date: March 24, 2025

*/s/ Steven A. Hirsch*
ELLIOT R. PETERS*
STEVEN A. HIRSCH (D.D.C. Bar No. CA00166)
AJAY S. KRISHNAN*
NIALL M. FRIZZELL*
MATTHEW P. GUIANG*

KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Tel: (415) 391-5400
Fax: (415) 397-7188
epeters@keker.com
shirsch@keker.com
akrishnan@keker.com
nfrizzell@keker.com
mguiang@keker.com

Attorneys for Plaintiff United Auburn Indian
Community of the Auburn Rancheria

*\* Pro hac vice applications forthcoming*

2890305